UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE ELLIS WALLACE,<br>　　　　　Plaintiff,<br>　　v.<br>DAVIS, et al.,<br>　　　　　Defendants. | Case No. 17-cv-05488-SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 23 |

This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 in which George Ellis Wallace alleges that three defendants subjected him to cruel and unusual punishment and that one defendant discriminated against him based on his race. Defendants now move for summary judgment on the merits of Wallace's claims and on their defense of qualified immunity. Wallace opposes the motion. For the reasons discussed below, Defendants' motion for summary judgment will be granted and judgment will be entered in their favor.

**BACKGROUND**

A. Statement Of Facts

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to the complaint occurred at Pelican Bay State Prison, a maximum-security prison. Pelican Bay's Facility A has eight housing units (identified as A1, A2, etc.), each of which houses approximately 128 inmates and has an adjoining enclosed concrete yard. Docket No. 23-2 at 2. Facility A also has two recreation yards divided by a fence and a gate. *Id.* at 3. During 2016, the gate was left open, so inmates could move back and forth between the two recreation yards. *Id.* The two recreation yards are referred to as the larger and smaller yards by

Defendants, and as the upper and lower yards by Wallace. *Id.*; Docket No. 24 at 1-2. Each recreation yard has tables, a basketball court, athletic equipment, and a toilet area. Docket No. 23-2 at 3. There were about 350 inmates on both recreation yards on the relevant day. *Id.*

There is a disagreement as to the duration of the primary events and omissions that gave rise to the complaint. The parties agree that the events and omissions occurred on December 7, 2016 and began at approximately 8:50 a.m. Docket. No. 1 at 5. Wallace states that the events and omissions ended around 1:45 p.m., while Defendants state that the events and omissions ended at 12:30 p.m. Docket No. 23-1 at 15; Docket No. 23-2 at 5. For summary judgment purposes, the Court views the facts in the light most favorable to the non-moving party and accepts Wallace's statement that the events and omissions in question ended around 1:45 p.m.

At approximately 8:50 a.m. on December 7, 2016, a fight broke out among inmates on the recreational yard; upon responding, prison officials discovered inmate-manufactured weapons in the larger yard for the second day in a row. Docket. No. 1 at 5; Docket. No. 24 at 1. To secure the safety and security of the prison, the staff, and the inmates, prison officials ordered all the inmates on the yards to "get down" on the ground while the prison officials conducted unclothed-body searches of all inmates present on the yards to look for contraband. Docket. No. 23-2 at 3-4.

According to prison procedures, during an emergency, inmates "must immediately stop whatever they are doing, remain where they are, and obtain a 'seated' position." Docket No. 23-2 at 3. Additionally, any inmate who violates the emergency protocol may be removed from the yard and subject to disciplinary action. *Id.* "It is always an exceptionally dangerous situation when there are hundreds of unrestrained inmates on the yard, and they significantly outnumber the correctional staff. To ensure the safety and security of the institution, staff and inmates, during an emergency situation, inmates are required to comply with all orders and remain compliant until all necessary actions are completed—in this case, the completion of the unclothed-body searches. While conducting searches for contraband, it is paramount to not allow inmate movement in order to prevent the destruction, disposal, or relocation of contraband." Docket No. 23-2 at 3. "Inmate-manufactured weapons are a constant and serious threat to the safety of staff and inmates, and to the overall security of the prison." Docket No. 23-2 at 2. During the searches of inmates on the yards

2

that day, multiple inmate weapons were found. Docket No. 23-2 at 4. Inmate weapons also had been found a day earlier in the area where the fight took place. *Id.*

When the fight broke out on the larger yard, Wallace was located in the smaller yard. *See* Docket No. 23-2 at 3, 9; Docket No. 24 at 1-2. Wallace was among the many inmates who had to sit or lie on the ground that cold day. Docket No. 24 at 2. The local temperature was between 38 and 48 degrees Fahrenheit that day. Docket No. 23-2 at 4. By about 10:13 a.m., prison staff had completed the unclothed body searches of about 200 inmates. *Id.* At 10:13 a.m., the unclothed-body searches were disrupted when 25 inmates, including Wallace, in the smaller recreation yard stood up and started to walk towards the toilet area. Docket No. 24 at 2. Prison officials considered these actions to be an immediate safety and security concern and ordered a Code 2 response to restore and maintain order on the yards. *Id.* "A Code Two response assembles a strike team of officers to respond to a call and provide less-lethal resources to restore and maintain order at an institution, should the emergency require such assistance." Docket No. 23-2 at 4. Additional correctional staff from other areas of the prison responded to control the disturbance. *Id.* Correctional staff immediately started repeating orders to "get down" via the public address system. *Id.* After multiple orders from various staff to get down, the inmates who had stood up returned down to the ground. *Id.*

Once prison officials were able to get the 25 non-compliant inmates back down on the ground, Defendant Buchanan ordered prison staff to handcuff and relocate the non-compliant inmates to the A4 concrete yard to isolate them from the compliant inmates for the duration of the searches. Docket No. 24 at 2; Docket No. 23-1 at 11-12.

The 25 non-compliant inmates were Caucasian, Hispanic, Asian, and African American. *See* Docket. No. 1 at 6. Wallace was one of the 25 inmates who took part in this demonstration and was subsequently relocated to the A4 concrete yard. Defendants Davis, Drager, and McMahan oversaw the non-compliant inmates at the A4 concrete yard. Defendant Drager was the presiding sergeant, Defendant Davis had direct contact with the inmates on the concrete yard, and Defendant McMahan operated the control booth. *See* Docket. No. 1 at 3.

Prison officials completed searching the compliant inmates on the recreation yards at

approximately 11:30 a.m. Docket No. 23-2 at 5. Defendant Buchanan then ordered the 25 non-compliant inmates to be removed from the A4 concrete yard. Before the non-compliant inmates were permitted to return to their housing units, the non-compliant inmates were scanned one-by-one with a metal detector and then underwent unclothed-body searches. *Id.* Wallace was kept in handcuffs on the concrete yard from 10:20 a.m. until 1:30 p.m. Docket. No. 24 at 4.

According to Wallace, he "used the restroom on" himself, "a little bit on the yard and on the concrete yard." Docket. No. 23-1 at 6. Sometime while Wallace was in handcuffs at the A4 concrete yard, Defendant Davis asked Defendant Drager if Wallace's handcuffs could be removed so that Wallace could use the restroom, but Defendant Drager refused the request. Docket No. 1 at 3-4. Defendant Davis informed Wallace that his handcuffs would not be removed, and that Wallace could use the showers later. *Id.* at 3. Wallace returned to his cell around 1:45 p.m. and cleaned himself. Docket. No. 23-1 at 15.

Wallace testified that he did not talk directly to Defendants Drager, McMahon, or Buchanan that day. Docket No. 23-1 at 18. Defendant Buchanan declares that he was not made aware that inmates needed to use the toilets or that inmates had urinated or defecated on themselves. Docket No. 23-2 at 5. Defendant Buchanan further stated that, if any inmates had requested to use the bathroom during the unclothed body searches, staff would have been instructed to inform the inmates that they would need to wait until the searches were completed. Docket No. 23-2 at 5. The rationale for not allowing toilet usage during a search was that, "if staff began escorting inmates to the bathroom in the middle of a security search, it would only delay the searches and jeopardize the integrity of the search." *Id.* Defendant Buchanan also stated that if he had learned that Wallace had defecated or urinated on himself, he would have instructed staff to take Wallace to the shower and provide him with clean clothing. *Id.* at 6.

On December 15, 2016, all of the non-compliant inmates, including Wallace, received Rules Violation Reports (RVRs) for disobeying orders and delaying the unclothed body searches on December 7, 2016. Docket. No. 23-1 at 9-11. Again, the non-compliant inmates were of varying races, including Caucasians, Hispanics, Asians, and African Americans. *Id.* Wallace is African American.

4

Wallace had a disciplinary hearing for his RVR on January 13, 2017. Docket. No. 23-2 at 6, 16. At the hearing, Wallace was found guilty of Willfully Resisting, Delaying, or Obstructing any Peace Officer in the Performance of Duty. *See* Cal. Code Regs., tit. 15 §3005(a); Docket No. 23-2 at 20. As a result of the guilty finding, Wallace was assessed 90-days loss of good-time credit and subjected to yard and privilege restrictions. *Id.* at 6, 21. The record does not indicate the results of the disciplinary hearings for the remaining non-compliant inmates who received RVRs.

B. <u>The Claims Alleged</u>

Wallace alleges that his Eighth Amendment rights were violated when correctional officers made him lie or sit on the cold concrete ground for several hours, did not allow him to use the bathroom once he was handcuffed, and denied him clean clothes after he defecated and urinated on himself. Docket. No. 8 at 4. Specifically, Wallace alleges that Defendant Drager would not remove Wallace's handcuffs so that Wallace could use the toilet, and that Defendant Drager refused to provide Wallace with clean clothes once Wallace soiled himself. *Id.* Additionally, Wallace alleges that Defendants Davis and McMahan failed to prevent or report this ill treatment of Wallace when Defendants oversaw Wallace and the other non-compliant inmates at the A4 concrete yard. *Id.*

Wallace alleges an Equal Protection claim against Defendant Buchanan based on unequal treatment of inmates of different races. Docket. No. 8 at 5. Wallace claims that Defendant Buchanan charged Wallace with a disciplinary offense while not charging other inmates "because a white inmate was with them" and "none of the white inmates . . . who were on the concret[e] yard with" Wallace were ultimately found guilty of their RVR offenses. Docket. No. 1 at 11.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

5

case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Wallace's complaint was signed under penalty of perjury and the facts therein are considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

A. Eighth Amendment Claim Against Defendants Drager, Davis, and McMahan

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail

6

shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*" (emphasis added). The Eighth Amendment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A plaintiff alleging that conditions of confinement amount to cruel and unusual punishment prohibited by the Eighth Amendment must satisfy a two-prong test. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). First, the plaintiff must satisfy an objective test showing that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, courts consider the circumstances, nature, and duration of the deprivation. *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Second, the plaintiff must prove that the prison official inflicted the deprivation with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to his health or safety. *Farmer*, 511 U.S. at 834.

### 1. Objective Prong

Regarding the first prong of the Eighth Amendment test, the Ninth Circuit in *Johnson* held that depriving inmates of adequate edible food, adequate amounts of drinking water, protection from the sun and heat, and adequate access to toilets for four days amounted to sufficiently serious conditions to establish an objectively serious deprivation. 217 F.3d at 732. The fact that prison officials occasionally misted inmates, provided 36 bottles of sunscreen for over 600 inmates when temperatures reached 94 degrees, and eventually provided two portable toilets that "could not meet the demand of so many prisoners and were often unusable, despite periodic servicing" was not adequate to show that their basic needs had been met. *Id.* at 730, 732. The court also found the objective prong satisfied for a separate incident in which prison officials kept inmates in subfreezing temperatures without access to toilets for 17 hours. *Id.* at 732. There, prison officials distributed blankets to inmates, but only after "the inmates had been lying motionless in the dirt in subfreezing temperatures for five to nine hours." *Id.* The court recognized that toilets can be "unavailable for some period of time without violating the Eighth Amendment" but the evidence indicated that "the

7

state imposed conditions inescapably result[ed] in prisoners wetting each other with urine." *Id.* at 733. The court found that the evidence presented for both instances could lead a fact-finder to conclude that plaintiffs suffered a sufficiently serious deprivation to violate their Eighth Amendment rights.

Various courts have considered whether and when a lack of toilet access rises to the level of posing a substantial risk of serious harm to inmates. Again, although finding multiple-day and 17-hour deprivations of toilet access to be sufficiently serious to satisfy the Eighth Amendment's objective prong, the Ninth Circuit in *Johnson* recognized that "toilets can be unavailable for some period of time without violating the Eighth Amendment." *Johnson*, 217 F.3d at 733. One district court concluded that denying a prisoner access to toilets and water for five and a half hours and four and a half hours on two separate occasions did not rise to the level of a sufficiently serious deprivation to violate the Eighth Amendment. *Wilkins v. Ahern,* No. 08–1084, 2008 WL 4542413, at *6 (N.D. Cal. Oct. 6, 2008). Another court held "that a temporary deprivation of access to toilets, in the absence of physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." *Kanvick v. Nevada*, No. 08-00397, 2010 WL 2162324, at *5-6 (D. Nev. Apr. 27, 2010) (deprivation of access to toilets for up to two hours during inmate counts on six occasions did "not amount to anything more than an inconvenience"). Similarly, in *Hernandez v. Battaglia*, the district court did not find an Eighth Amendment violation when prisoners were handcuffed and detained in the prison yard and lacked access to food, water, and toilets for less than five hours while prison faculty searched the living quarters and temperatures reached 85 degrees. 673 F. Supp. 2d 673, 676-78 (N.D. Ill. 2009). *See also Murillo v. MacDonald*, No. 12-1220, 2012 WL 12903824, at *3 (D. Ariz. July 27, 2012), *aff'd*, 536 Fed. Appx. 753 (9th Cir. 2013) (having to wait for access to a toilet on a daily basis for an hour or an hour and a half does not rise to the level of an Eighth Amendment violation); *Stevenson v. Adams*, No. 11-00720, 2012 WL 967650, at *5 (E.D. Cal. Mar. 21, 2012) (allegation that inmate had to stay in a cold, dirty, and bug-infested holding cell overnight in underwear and without access to toilet did not amount to a sufficiently serious deprivation to satisfy objective prong of Eighth Amendment claim).

The evidence in the record shows that Wallace endured a temporary deprivation of access to

toilets for less than five hours. There is no evidence in the record that Wallace was physically harmed or that he risked contamination or disease when sitting in his soiled clothing. While Wallace may have experienced discomfort, there is no evidence that his temporary lack of access to toilets placed him at a substantial risk of serious harm, nor is there evidence that he actually suffered any physical injury. Being denied access to a toilet for less than five hours during a security incident simply does not amount to a sufficiently serious condition to satisfy the Eighth Amendment's objective prong.

Wallace also claims that Defendants violated his Eighth Amendment rights when he was handcuffed and forced to lie on the cold ground – he was in the cold weather for less than five hours and was on the ground in restraints for eighty-five minutes after he was moved to the A4 concrete yard. Docket No. 24 at 2. "Prisoners have a right to protection from the extreme cold." *Micenheimer v. Soto*, No. 13-3853, 2013 WL 5217467, at *5 (C.D. Cal. Sept. 16, 2013) (citing *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir. 1997)). "Whether an inmate's exposure to cold temperatures constitutes an Eighth Amendment violation depends on the severity of the cold, the duration of the prisoner's exposure, the presence of an alternative means to warmth (*i.e.,* a blanket or jacket), the efficacy of that alternative, and the presence of other uncomfortable conditions." *Id.* (internal citations and quotations omitted). In *Micenheimer*, the court found that plaintiff adequately pled sufficiently serious conditions of confinement by alleging he was "forced to endure cold temperatures for at least seven weeks when his cell received no heat and continued to be exposed to cold air from the air conditioner despite below-freezing outside temperatures as low as 9 degrees Fahrenheit" without thermal bedding. *Id.* That plaintiff became ill due to his exposure to cold temperatures. *Id. See also Palmer v. Johnson*, 193 F.3d 346, 353 (5th Cir. 1999) (inmates endured a sufficiently serious condition when they "were reduced to digging in the dirt to construct loose earthen walls as feeble wind barriers" for a period of seventeen hours). Here, Wallace had to sit or lie on the ground for less than five hours when temperatures were in the range of 38 to 48 degrees Fahrenheit. There is no evidence that he was not dressed for the weather – when he was first told to get on the ground, he was already among the inmates out on the recreation yards for their recreation time. While the chilly weather doubtless was uncomfortable, this short-term stint in

9

1 above-freezing temperatures during a search does not rise to the level of an objectively serious
2 condition that satisfies the Eighth Amendment's objective prong.

### 2. Subjective Prong

Next, regarding the second prong for Eighth Amendment test, a prison official must be criminally reckless, i.e. he must know of and disregard an excessive risk to inmate health or safety, to be liable for an Eighth Amendment violation. *See Farmer*, 511 U.S. at 837; *see Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). Neither accidental conduct nor negligence constitutes prohibited conduct, for "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishment Clause. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Here, Wallace has not presented any evidence that would allow a reasonable jury to find that the Defendants knew Wallace faced a substantial risk of serious harm if he was kept outdoors in cold weather and deprived toilet access for less than five hours, and that Defendants disregarded this risk in spite of this knowledge. Nor has Wallace presented evidence that Defendants actually were aware that Wallace soiled himself and did not permit Wallace to clean himself while also knowing that Wallace faced a substantial risk to his health and safety by sitting in soiled clothing.

Wallace argues that, due to his physical distance from the fight and weapons, Defendants should not have subjected him to detention or search because Defendants reasonably should have known that he was not involved in the fight nor in possession of weapons. *See* Docket No. 26 at 2-3; Docket No. 1 at 5-6. Wallace points out that he was not a participant in, or near, the location of the fight or the weapons that were initially found. However, courts give significant deference to prison officials regarding security concerns. *See Olivier v. Baca*, 913 F.3d 852, 858-60 (9th Cir. 2019) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("[correction officials] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). And, "[i]n the context of disturbances by inmates and lockdowns, [the Ninth Circuit has] held that such issues can delay detention facility procedures and temporarily restrict certain rights without

violating the Eighth Amendment." *Id.* at 858; *cf. id.* at 859 (jailers did not violate plaintiff's right to due process by depriving him of a bed for three-and-a-half days as jailers attempted to quell ongoing jail riots and disturbances). Here, Defendants needed to ensure that inmate-manufactured weapons were no longer available and chose to address that threat by detaining and searching all inmates on the recreation yards following the first disturbance of the day (and after weapons had been found the preceding day). Although Wallace may not have been involved in the disturbance and may not have had a weapon, prison officials' decision to search *everyone* on the recreation yards to look for more weapons was the sort of judgment call by correctional officials regarding institutional security that is accorded deference by the court.

Additionally, Wallace argues that Defendants must have known that Wallace soiled himself because Wallace and the other non-compliant inmates were restrained for three hours after moving towards the toilets. Furthermore, Wallace urges that Defendants purposefully deprived Wallace toilet access to punish Wallace. Docket No. 24 at 9. However, Wallace provides no evidence to support his speculation about Defendants' thoughts. The evidence in the record shows only that Wallace asked Davis to use a toilet – Wallace did not talk to the other defendants at all and he did not tell any defendant he had soiled himself. The Eighth Amendment's subjective prong requires that the defendants actually be aware of facts, not that there are facts of which they should have been aware. Without any evidence that Defendants at least exhibited criminal recklessness, Wallace fails to satisfy the second prong required to succeed on an Eighth Amendment claim.

Wallace contends that Defendants should have known that the reason the non-compliant inmates initially moved and got up was to use the restroom because several non-compliant inmates previously requested to use the toilets. Docket No. 24 at 2-3. Regardless of their purpose, the fact remains that inmates en masse were disobeying orders to get down and stay down during the searches after weapons had been found. Deciding to move these non-compliant inmates to the A4 concrete yard was a reasonable response to the potential threat they posed to the correctional staff who were outnumbered by inmates.

Wallace urges that the medication for his high blood pressure caused him to need to urinate with greater frequency and that Defendant Drager did not take Wallace's medical condition into

11

account when ordering that Wallace be handcuffed or denied access to a toilet. Docket No. 1 at 13-14. However, Wallace does not offer evidence indicating that Defendant Drager was even aware of his medical condition. Defendant Drager could not consciously disregard a condition of which he was unaware.

Finally, Wallace argues that Defendants' search procedures did not comply with California Code of Regulations Title 15 § 3287(b). Docket No. 26 at 1-3. Compliance or non-compliance with state law has no bearing on the analysis of the federal constitutional claims asserted in the complaint.

Viewing the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party, that evidence shows that Wallace was detained in cold weather and denied access to a toilet for less than five hours, during which time he soiled himself. Even accepting these facts as true, Wallace fails on his Eighth Amendment claim because the conditions did not pose substantial risks to Wallace's health and safety. Wallace also has not shown that Defendants were aware of and disregarded a substantial risk to his health and safety. Wallace's Eighth Amendment claim fails.

B. Equal Protection Claim Against Defendant Buchanan

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburn v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "To state a § 1983 claim for violation of the Equal Protection Clause a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (citation and internal quotation marks omitted).

Wallace claims that Defendant Buchanan discriminated against him due to his race because Wallace, an African American, was found guilty of his RVR but none of the non-compliant Caucasian inmates were found guilty of their RVRs. Wallace provides no evidence to substantiate allegations that Caucasian inmates were not found guilty in their disciplinary hearings. Wallace

does not dispute Defendants' evidence showing that prison officials issued RVRs to every non-compliant inmate, regardless of his race. Wallace also provides no evidence as to the outcomes in other inmates' disciplinary proceedings. Due to the complete absence of evidence of unequal treatment of similarly situated inmates, Defendant Buchanan is entitled to judgment as a matter of law in his favor on the equal protection claim.

Wallace also alleges that there were certain "Mexican and white" inmates who stood up to use the restroom earlier than he and the other 24 inmates who got up at 10:13, and that they were taken to the A3 concrete yard instead of the A4 concrete yard and were not issued RVRs. Docket No. 1 at 6; Docket No. 24 at 6. Wallace provides no evidence of who these inmates were, what they did or did not receive in terms of disciplinary violations, or that they performed the same actions as Wallace and the other non-compliant inmates. Due to the absence of any evidence that these inmates were similarly situated to Wallace yet treated differently, this equal protection claim also does not survive summary judgment.

### C. Qualified Immunity Defense

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

The Court has concluded that the evidence fails to show a violation of Wallace's Eighth or Fourteenth Amendment rights. Therefore, all Defendants prevail on the first prong of the *Saucier* test. Defendants Drager, Davis, McMahan are entitled to qualified immunity against the Eighth

13

Amendment claim and Defendant Buchanan is entitled to qualified immunity against the Fourteenth Amendment claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Docket. No. 23. Defendants Davis, Drager, McMahan, and Buchanan are entitled to judgment as a matter of law in their favor on the merits of Plaintiff Wallace's claims and on the defense of qualified immunity.

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: February 15, 2019

SUSAN ILLSTON
United States District Judge